In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1795

SHAN FIELDMAN,

*Petitioner-Appellee,*

*v.*

CHRISTINE BRANNON, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 15-cv-1389 — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED JANUARY 16, 2020 — DECIDED AUGUST 12, 2020

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* On July 23, 2010, Shan Fieldman climbed into a truck in a Walmart parking lot and told a hitman that he wanted his ex-wife and her boyfriend killed. The hitman was in fact an undercover police officer who videotaped their conversation. Fieldman was charged and tried in Illinois state court for solicitation of murder for hire.

Fieldman defended against the state's charges by contesting his intent (a necessary element of the offense) to have his ex-wife and her boyfriend killed. To that end, because a police informant brokered his meeting with the hitman, Fieldman sought to testify about his interactions with that informant during the five weeks before his conversation with the hitman. Fieldman believed this testimony would provide the jury with critical contextual information about his state of mind and demonstrate that his meeting with the hitman was a charade.

But the Illinois trial court did not allow the jury to hear this testimony because the court concluded it was irrelevant. Fieldman was convicted and unsuccessfully appealed his convictions through the Illinois state courts.

In this federal collateral attack on his conviction, Fieldman contends the court's exclusion of his testimony deprived him of his federal constitutional right to present a complete defense. We agree. The court's exclusion was contrary to clearly established federal law confirming a defendant's right to testify, on his own behalf, about circumstances bearing directly on his guilt or innocence or the jury's ascertainment of guilt. *See Crane v. Kentucky*, 476 U.S. 683 (1986); *Rock v. Arkansas*, 483 U.S. 44 (1987). And the exclusion of material portions of his testimony had a detrimental effect on his interests because it undercut his entire defense and effectively prevented him from challenging the state's strongest evidence. We therefore affirm the district court's grant of habeas relief.

## I. BACKGROUND

In the summer of 2010, Trina Bennett, a police informant who was an acquaintance of Fieldman, relayed to Illinois State

Police Agent Darrell Stafford, that a man, Shan Fieldman, wanted his ex-wife killed. After receiving this tip, Agent Stafford obtained a court order and began recording phone calls Trina made to Fieldman.

The first two times Trina tried to reach Fieldman, her calls went unanswered: she would leave a message, but Fieldman never called her back. On the third try, however, Fieldman's girlfriend answered the phone and handed it to Fieldman. In that call, Trina arranged an in-person meeting between Fieldman and a "friend" of Trina's, Earl Candler, who was an undercover Illinois State Police sergeant posing as a hitman. The meeting would take place later that day, and Trina advised Fieldman that he would need a $200 down payment.

On the evening of Friday, July 23, 2010, Fieldman met with Candler in the parking lot of the Walmart in Pontiac, Illinois. The meeting took place inside Candler's truck, which was equipped with audio and video recording devices.

Candler opened up the conversation by offering Fieldman a beer then stating that Trina relayed Fieldman had a problem. Fieldman agreed and stated his ex-wife, Shelley, was a "big problem." Candler responded that he, too, once "had an ex-wife" who "had an unfortunate accident." Fieldman told Candler that he wanted Shelley killed. Candler added that Trina mentioned Shelley's boyfriend, Alan Chrossfield. Fieldman replied, "She's got a boyfriend but um I mean, if he happens to be there and that's the only way it can be handled, then, but if not."

Candler pressed Fieldman for details that would aid in carrying out the murder for hire. Fieldman did not bring Shelley's picture or address with him to the meeting, but he

explained she maintained a Facebook account under her maiden name, where Candler could find her photos. Fieldman described Shelley's house and car and divulged that Shelley and Alan spent a fair amount of time drinking in the garage. But Fieldman advised Candler that the pair would be out of town that weekend, and that he didn't want Candler to act too quickly.

Fieldman agreed to pay Candler $7500 to murder Shelley and Alan, which was discounted because Trina owed Candler a favor. But Fieldman did not bring any money to the meeting. Candler warned Fieldman that failure to pay was not an option, and, "understand that I will get my money." To obtain a down payment, Candler dialed Fieldman's girlfriend, and Fieldman arranged to gather whatever cash she carried in her purse. So, Fieldman left and returned with $100 for a down payment, explaining it was all he could obtain. At Candler's request, Fieldman handed over a written IOU for the remainder, payable "at the completion of the job." Candler informed Fieldman this would be their final interaction and that, by the same time next week, Shelley—and possibly Alan—would be dead.

Pontiac Police arrested Fieldman later that evening during a traffic stop, and Fieldman was charged and tried in Illinois state court for the solicitation of murder for hire of Shelley and Alan. 720 ILCS 5/8-1.2.

At trial, Shelley testified that she and Fieldman got along amicably after their divorce in 2002, and Alan and Fieldman had become friends. Indeed, Alan went to New Orleans to live with Fieldman while Fieldman provided him with work. During that time, Fieldman and Alan lived together for about five or six months. The state also played the video-recording

of Fieldman's meeting with Candler, as well as the recorded phone calls between Trina and Fieldman.

Fieldman took the stand to testify in his defense. He contended that he did not commit solicitation of murder for hire because he never intended for Candler to kill Shelley; and under Illinois law, "[a] person commits the offense of solicitation of murder for hire when, *with the intent that the offense of first-degree murder be committed*, he [] procures another to commit that offense." 720 ILCS 5/8-1.2(a) (emphasis added). Fieldman asserted that he only agreed to meet with a hitman because he was afraid of Trina.

He testified that Trina had incessantly badgered him over the five weeks leading up to the meeting, and he felt agreeing to the meeting was the best way to get Trina to leave him alone. So, he decided to go to the meeting, gather information, and relay that information to friends of his who worked at the Dwight police station a half a block from Shelley's house.

When assessing the credibility of Fieldman's testimony alongside the audio and video recordings, a rational juror could reasonably disbelieve Fieldman's version of events and convict Fieldman for the solicitation of murder for hire of Shelley and Alan. But the jury never heard critical testimony about *why* Fieldman feared Trina. Because of its importance, we recount the omitted testimony about Fieldman's interactions with Trina in the two months leading up to the meeting with Candler.

In late May 2010, Fieldman's girlfriend, Talia, introduced him to Trina.[1] It's safe to say that Fieldman characterizes Trina as a seedy character who was always seeking a way to procure money from the people around her. Upon finding out that Fieldman was an electrician, Trina remarked that electricians make good money and asked specific questions about his pension and benefits.

In mid-June, a few weeks after Fieldman met Trina, he and Talia went to a gathering at Trina's house. There, she regaled him with a story of a time she broke into a grocery store and took cigarettes and lottery tickets. Trina also casually told him that she robbed an elderly man's house for fun, duct taped him to a chair, and then "bl[e]w his brains out" in front of a child. Fieldman was frightened and sickened by this revelation. Trina continued and asked Fieldman if he had "ever been mad at anybody," because she "had people that she would know could take care of jobs if [he] had that." Fieldman responded that he had been mad at people—he was only human after all—but he had no interest in having anyone killed. Trina brought up Shelley and asked whether he "ever wanted anything done to her." Fieldman said no, but Trina pressed on, telling him that "I know some people in prison and I know lots of people. I can get that job done anytime you want." Startled, Fieldman replied that he wanted no part of that, and walked away. He and Talia left Trina's house shortly thereafter.

---

[1] Fieldman testified to this information (outside the presence of the jury) in an offer of proof so that the court could rule on the admissibility of his testimony.

Over the next couple of weeks, Trina repeatedly called Talia and asked to speak to Fieldman; she also kept "bugging" Talia for money. Fieldman refused to speak with her and did not return her calls. Talia, perhaps tired of receiving so many calls from Trina about needing money, eventually told Fieldman he needed to call her back. Fieldman called Trina back, and she said that she had people visiting from Chicago "here to do the job" and that Fieldman needed to meet with her to give her $200–$300. Fieldman told her, "no way," and expressed confusion about her phone call. He exclaimed that they hadn't spoken in weeks, and he didn't know what job she was talking about or understand why she continued calling him. Trina angrily insisted that he pay her some money for "the job," or at least give her some money for a hotel room. More specifically, she needed a couple hundred dollars. Fieldman refused to give her any money, and he did not meet with her.

This pattern continued over the next couple of weeks. Trina would call Talia, who would then hand the phone to Fieldman. For example, the day after the phone call about the hotel, Trina called and said she would do the hit job for next to nothing; all she needed was to stop by his house and get a picture of Shelley. Fieldman again declined, said he didn't want anything done to Shelley, and he demanded that she leave him alone. A week later Trina called and asked if Shelley was on Facebook and said she would look up her information herself. Fieldman gave her fake names for himself, "Shan Gills," and his ex-wife, "Stephanie Gills."

Another week later, (about ten days before Fieldman's meeting with Candler), Talia underwent surgery. The night before Talia's surgery, Fieldman overheard Talia on

speakerphone with Trina. Trina asked Talia where the sur-
gery was being done, how long she and Fieldman would be
gone, when they would be getting back, and if anybody
would be at their house. Fieldman took Talia to the surgery
and when they returned seven hours later, he noticed their
dog was outside, even though the dog always remained in-
side the house, including that morning. Once inside, Field-
man discovered that money had been stolen. When asked
what went through Fieldman's mind after this incident, he
said:

> I was starting to get scared because not only she was trying
> to check on Facebook on her own, hire people on her own,
> now she's … coming into my house looking for pictures and
> trying to take care of this all by herself. I'm not calling her.
> I'm not answering any of her phone calls, not talking to her
> but yet she still keeps pushing and pushing … [M]oney was
> always an issue with her which she talked about from day
> one … I really started fearing for my family and others.

Trina called Fieldman several times on July 22, this time
on his cell phone, and left a message when he didn't pick up.
(These are the phone calls recorded by the police). Fieldman
didn't return her phone call, and Trina called Fieldman once
again on July 23. This time, Talia answered his phone while
Fieldman was picking up mail at the post office and handed
the phone to him when he exited the building. This was the
call in which Trina arranged for Fieldman to meet with Can-
dler later that evening, which Fieldman agreed to.

Fieldman initially had no intention to meet with a hitman
in Pontiac on July 23, even after speaking with Trina. This
changed when Fieldman's plans to go back home, twenty-five
minutes away in Cullom, were put on hold so that Talia could
visit with her terminally ill grandfather who lived in Pontiac.

At that point, and after giving it some thought, Fieldman decided that if he was ever going to deter Trina, the proposed meeting with Candler came at an opportune moment: Shelley, Alan, and their children would be out of town when he met with Candler. He planned to meet with Candler, gather information, and take it to his friends at the Dwight police department.

After the meeting with Candler, Talia called and asked Fieldman if he would pick up her sons in Pontiac and take them home so she could stay with her grandfather. As we know, Fieldman's plan to go to the Dwight police with information did not work as he intended—he was pulled over and arrested by Pontiac police while driving Talia's boys back home.

The jury heard little of what we've just described about the interactions between Trina and Fieldman in the five weeks leading up to the meeting. That's because the trial court believed the details of his interactions with Trina in the "five, six, seven weeks" leading up to the meeting were "irrelevant" to his explanation of why he went to the meeting with Candler and whether Fieldman intended for the pair to be killed. Instead, the court limited Fieldman to testifying "that he did not intend to have Shelley killed *that day*."

To be sure, the jury heard some testimony about Fieldman's fear of Trina; but it lacked essential context about the interactions that prompted those fears. Here's what the jury did hear: Fieldman began to describe one of his early interactions with Trina, telling the jury that Trina had robbed a grocery store. Fieldman's attorney asked what else Fieldman had learned in that conversation, but the trial court prevented Fieldman from finishing the story. Instead, the jury heard that

Fieldman grew concerned during his conversation because Trina "told me of just the different crimes that she committed and the fact that she had told me that she had held up a guy at a house, an old man; and when he wouldn't listen and got angry that she duct taped him to a chair." He also testified that he gave Trina fake names for himself and his ex-wife; that he avoided calls from Trina because he knew what they "were pertaining to" and "didn't want to call back"; that he decided to attend with the hitman because he wanted Trina's "badgering" to be "done and over with"; and that he did not intend for the hitman to commit the murders, but instead intended to go to the police.

In the end, Fieldman's assertion that he was not guilty relied only on his avowal that he lacked intent—without any factual context—for Shelley and Alan to be killed. Fieldman believes the excluded testimony was crucial to his defense that he did not intend for a hired hand to commit the murders.

In May 2011, the jury convicted Fieldman on two counts of solicitation for murder for hire—one count for Shelley and one count for Alan. Fieldman unsuccessfully appealed his case, *pro se*, through the Illinois state court system. So, Fieldman turned to federal court for relief in 2015, this time represented by counsel. He filed a petition for a writ of habeas corpus, alleging the trial court's exclusion of his testimony about his interactions with Trina violated his due-process right to present a complete defense. The district court agreed with Fieldman and granted a writ of habeas corpus in 2019. The state appealed.

## II. ANALYSIS

Fieldman's claim raised in his petition for a writ of habeas corpus is controlled by stringent requirements of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2254(d).[2] In order to be entitled to habeas relief, one of AEDPA's requirements is that any claim a state court adjudicated on the merits must have ended in a decision, by the state court, that is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1).[3]

---

[2] We apply a *de novo* standard of review to constitutional claims not "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *see Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012). Whether the Illinois court "adjudicated on the merits" the constitutional question at issue is a closer call than in other cases. While Fieldman clearly and cogently raised, to the Illinois appeals court, the federal constitutional claim he now raises, that court did not frame its discussion of Fieldman's argument as a constitutional due process issue. *See People v. Fieldman*, 2013 IL App (4th) 111065-U, ¶¶ 27–31 (quoting *People v. Jackson*, 2012 IL App (1st) 100398, ¶ 31, which in turn relies on *Washington v. Texas*, 388 U.S. 14, 19 (1967)). *See generally Harrington v. Richter*, 562 U.S. 86, 99–100 (2011); *Adorno v. Melvin*, 876 F.3d 917, 921 (7th Cir. 2017). But the Illinois appellate court did not indicate in its opinion that it avoided a decision on the merits of Fieldman's federal constitutional challenge. Regardless, Fieldman has not contended that the non-deferential standard of review applies. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009) ("because Mirzayance has not argued that § 2254(d) is entirely inapplicable to his claim or that the state court failed to reach an adjudication on the merits, we initially evaluate his claim through the deferential lens of § 2254(d)"); *Lee v. Avila*, 871 F.3d 565, 572 (7th Cir. 2017).

[3] We look to the last court to address a petitioner's claim on the merits. *Wilson v. Sellers*, 138 S. Ct. 1188, 1196 (2018). In this case, the relevant state-court decision is the Illinois appeals court's decision in *Fieldman*, 2013 IL 111065-U.

This standard is "difficult to meet," and we give substantial deference to a state court's decision. *Adorno v. Melvin*, 876 F.3d 917, 920 (7th Cir. 2017).

Before turning to the merits of Fieldman's claim, we address one preliminary matter: the state's argument that Fieldman's claim is not the sort we may review in a federal habeas proceeding. The state contends that an evidentiary ruling that turns on state law—here, exclusion of evidence based on relevance—cannot form the basis of a federal habeas claim. *See Morgan v. Krenke*, 232 F.3d 562, 566 (7th Cir. 2000). We disagree.

Run-of-the-mill state law errors usually do not provide a basis for federal habeas relief because a habeas petitioner may obtain relief only if a state court rendered a decision "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). "To say that a petitioner's claim is not cognizable on habeas review is thus another way of saying that his claim 'presents no federal issue at all.'" *Perruquet*, 390 F.3d at 511 (quoting *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991)).

We have, on many occasions, considered a state court's evidentiary rulings when those rulings implicate a federal constitutional question, such as whether the application of a state evidentiary rule violated a defendant's right to present a defense. *Cf. Kubsch v. Neal*, 838 F.3d 845, 853 (7th Cir. 2016) (en banc); *Harris v. Thompson*, 698 F.3d 609, 635 (7th Cir. 2012). We do not sit to correct all errors made by a state court. Instead, the question posed is whether the damage done to Fieldman's defense by the trial court's exclusion of his testimony violated his right to present a complete defense. In this context, "the

last word does not belong to state law; it belongs to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Kubsch*, 838 F.3d at 853–54.

Weighty constitutional principles are present in this case: Fieldman has a right—under the federal constitution—to testify on his own behalf about his lack of intent to commit the crime for which he was accused, a cornerstone of his fundamental constitutional right to a "meaningful opportunity to present a complete defense." *See Crane*, 476 U.S. at 690 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *Rock*, 483 U.S. at 55–56. Fieldman's claim is about the scope of that right and is reviewable in a federal habeas proceeding. We turn now to the merits of his claim.

*A. Clearly Established Federal Law*

Again, Section 2254 restricts habeas relief to cases in which the state-court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Clearly established federal law refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade,* 538 U.S. 63, 71–72 (2003).

We first explain why Fieldman's claim is based on clearly established federal constitutional law involving the right to present a defense. We then address why the state trial court's exclusion of Fieldman's testimony was a decision contrary to this clearly established law.

The Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the Sixth Amendment

guarantee a right to "a meaningful opportunity to present a complete defense." *Crane*, 476 U.S. at 690 (quoting *Trombetta*, 467 U.S. at 485); *see also Strickland v. Washington*, 466 U.S. 668, 684–85 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial through the several provisions of the Sixth Amendment."). Because the Supreme Court determines the contours of clearly established federal law, we turn our attention to the Court's decisions addressing a defendant's right to meaningfully present a complete defense.

The Constitution guarantees a criminal defendant "an opportunity to be heard in his defense," which the Supreme Court has said includes the right "to offer testimony." *In re Oliver*, 333 U.S. 257, 273 (1948). Related to one's opportunity to be heard is "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). The Supreme Court later described the "essence" of this right as "a fair opportunity to defend against the State's accusations," *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and "a meaningful opportunity to present a complete defense." *Crane*, 476 U.S. at 686–87 (quoting *Trombetta*, 467 U.S. at 485); *accord Holmes v. South Carolina*, 547 U.S. 319, 325 (2006).

"Fundamental" to one's opportunity to be heard is a defendant's "right to take the witness stand and to testify in his [] own defense" and "present his own version of events in his own words." *Rock*, 483 U.S. at 49, 52. The accused's right to testify in his defense is "particularly significant, as it is the defendant who is the target of any criminal prosecution." *United States v. Scheffer*, 523 U.S. 303, 315–16 (1998) (quoting *Rock*, 483 U.S. at 52). Indeed, "the most important witness for the

defense in many criminal cases is the defendant himself." *Rock*, 483 U.S. at 52. This is especially true when a defendant's testimony is "central to the defendant's claim of innocence," *Crane*, 476 U.S. at 690, or to the jury's "ascertainment of guilt." *Chambers*, 410 U.S. at 302.

In sum, the Supreme Court has clearly established that an integral part of the right to present a complete defense is a defendant's right to testify, on his own behalf, about circumstances bearing directly on his guilt or innocence or the jury's ascertainment of guilt. *See Crane*, 476 U.S. at 690; *Rock*, 483 U.S. at 55–56.

But this right is not absolute. A defendant's exercise of his right to testify about circumstances "central to the defendant's claim of innocence," *Crane*, 476 U.S. at 690, may run headlong into state evidentiary rules "designed to ensure" the admission of reliable evidence. *Rock*, 483 U.S. at 53. Those rules may prevent the admission of a defendant's testimony without offending the defendant's right to testify. But when an evidentiary ruling "infring[es] upon a weighty interest of the accused" and is "arbitrary or disproportionate to the purposes [the rule is] designed to serve," *Holmes*, 547 U.S. at 324 (quoting *Scheffer*, 523 U.S. at 308), then the applicable "state evidentiary rules" must "yield to the defendant's fundamental due-process right to present a defense." *Kubsch*, 838 F.3d at 855–56.

Thus, in order to determine whether a state court's decision is contrary to the clearly established standard we identified above, we first consider whether the state court's exclusion infringed upon Fieldman's weighty interest in his constitutional right to present a defense. Then, we determine whether the court's exclusion was arbitrary to the purposes

served by the rule. Finally, we determine whether the excluded evidence was material and favorable to Fieldman's defense.[4]

### B. *Contrary to Clearly Established Federal Law*

A state court's decision is "contrary to" clearly established federal law, under Section 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (brackets in original). But the Court has never insisted on virtual identity between its precedent and the state court's decision. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). A decision can be contrary to federal law even if the state court decision "involves a set of facts 'different

---

[4] Fieldman relies on *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982), to make the following assertion in his briefing: "[t]o establish a violation of the right to present a defense, a defendant must demonstrate that the evidence he was not allowed to present would have been favorable and material." Though the state does not dispute this assertion, it's not clear this analysis should apply to a defendant's own testimony. *See Crane*, 476 U.S. 683 (no consideration of materiality and favorability); *Rock*, 483 U.S. 44 (same); *Holmes*, 547 U.S. 319 (same); *Kubsch*, 838 F.3d 845 (same); *but see Makiel v. Butler*, 782 F.3d 882, 908 (7th Cir. 2015) (considering materiality and favorability); *Harris*, 698 F.3d 609, 627 (same). And in *Rock*, the Court made the following observation: "Logically included in the accused's right to call witnesses whose testimony is 'material and favorable to his defense,' *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982), is a right to testify himself, should he decide it is in his favor to do so. In fact, the most important witness for the defense in many criminal cases is the defendant himself." 483 U.S. at 52. For the purposes of this case, we assume without deciding that the excluded testimony must have been material and favorable.

from those of the case in which the principle was announced.'" *Id.* (quoting *Lockyer,* 538 U.S. at 76). However, we are mindful that we cannot frame the Court's decisions at "a high level of generality." *Nevada v. Jackson,* 569 U.S. 505, 512 (2013) (per curiam).

*1. Exclusion Infringed upon a Weighty Interest of the Accused*

With that admonition in mind, we turn to discussing two cases that bear directly on Fieldman's claim: *Crane v. Kentucky* and *Rock v. Arkansas*.

In *Crane v. Kentucky*, the Court held that the defendant's right to testify on his own behalf included the right to testify about the circumstances surrounding his confession, which the defendant argued was false and was the result of police badgering. 476 U.S. at 685. The case involved the testimony of a sixteen-year-old defendant whom police arrested for his suspected role in holding up a service station. While detained, the defendant "out of the clear blue sky" confessed to the murder of a liquor-store employee and a litany of other local crimes. *Id.* at 684. He was charged for the murder, and he moved to suppress his confession, claiming he had been "badgered into making a false confession." *Id.* at 685. The trial court disagreed and determined the confession was voluntary and admissible.

At trial, the defendant's "entire defense" rested on an argument that his "earlier admission of guilt was not to be believed." *Id.* at 691. To that end, he wished to testify about "the physical and psychological environment in which the confession was obtained" to "suggest that the statement was unworthy of belief." *Id.* at 684. But the application of a Kentucky rule of evidence prevented the defendant from "develop[ing] in

front of the jury any evidence about the duration of the inter-rogation or the individuals who were in attendance." *Id.* at 686. Under that rule, once a confession has been found to be voluntary, evidence supporting that finding may not be introduced at trial to challenge its credibility.

The Court had "little trouble concluding" that the court's "blanket exclusion of the proffered testimony about the circumstances of [the defendant's] confession deprived him of a fair trial" as well as "his fundamental constitutional right to a fair opportunity to present a defense." *Id.* at 687.

The court gave a number of reasons for its conclusion. It believed the opportunity to be heard would "be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Id.* at 690. Such an exclusion of "exculpatory evidence," it continued, "deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690–91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

Evidence about the "circumstances that prompted his confession" was "especially relevant" in his case. *Id.* at 691. After all, the defendant's "entire defense" was that his "earlier admission of guilt was not to be believed," and "introducing evidence of the physical circumstances that yielded the confession was all but indispensable to any chance of its succeeding." *Id.* at 691.

The following year, in *Rock v. Arkansas*, the Court similarly held that the defendant's right to testify on her own behalf included the right to present hypnotically refreshed

testimony about the circumstances leading up to the fatal shooting of her husband, which she maintained was accidental. 483 U.S. 44. There, a woman was tried for manslaughter for her husband's death, and she underwent hypnosis to try to remember details of the underlying events. After hypnosis sessions, she recalled details about the shooting and wanted to testify with her refreshed memory. But the Arkansas trial court excluded the hypnotically refreshed testimony. The defendant challenged this ruling as an infringement of her right to testify on her own behalf.

The Supreme Court recognized that the case was "not the first time" the Court had "faced a constitutional challenge to a state rule, designed to ensure trustworthy evidence, that interfered with the ability of a defendant to offer testimony." *Id.* at 53. The application of the Arkansas rule here, the Court determined, "had a significant adverse effect on petitioner's ability to testify." *Id.* at 57. For example, "[i]t virtually prevented her from describing any of the events that occurred on the day of the shooting," including "the actual shooting." *Id.* The Court also observed the Arkansas rule prevented the defendant from testifying "that she did not have her finger on the trigger and that the gun went off when her husband hit her arm." *Id.* This testimony was additionally important because it would have afforded "greater significance" to expert testimony about the manner in which the gun was fired. *Id.*

The Court concluded that when a defendant's constitutional "right to testify" is at stake, a state may not apply a rule of evidence that "permits a witness to take the stand" but then "arbitrarily excludes material portions" of the witness's testimony. *Id.* at 55. The Court explained: "There is no justification today for a rule that denies an accused the opportunity to

offer his own testimony" because "the defendant's veracity … can be tested adequately by cross-examination." *Id.* at 52. The Court accordingly held that Arkansas's rule excluding all hypnotically refreshed testimony impermissibly infringed the defendant's right to testify on her own behalf. *Id.* at 62.

Fieldman's challenge meets a comparable end. The exclusion of his testimony implicates the weighty interest identified in *Crane* and *Rock*—the right to a meaningful opportunity to present a complete defense—and the exclusion of his testimony had a similarly adverse effect.

Fieldman argues persuasively that the state's key evidence against him was tantamount to a recorded confession, like in *Crane*. That key evidence is the video-audio recording of Fieldman's meeting with Candler, the undercover police officer, when they talked about arrangements for Candler to kill Shelley and Alan. We agree that the video played a central role in the state's case. In the trial court's words, that video "stands out more than any other" evidence; that it was "[c]hilling is really an understatement."

To negate this highly incriminating video evidence, Fieldman's "entire defense" consisted of convincing the jury, through testimony about his escalating and alarming interactions with Trina, that he did not intend for Candler to carry out the murders. *Crane*, 476 U.S. at 691. Fieldman's lack of intent to commit the murder was a crucial part of his defense because under Illinois law, "a person commits solicitation of murder for hire when, *with the intent that the offense of first-degree murder be committed*, he [] procures another to commit that offense." 720 ILCS 5/8-1.2(a) (emphasis added). This means that the state must prove intent beyond a reasonable doubt, and the accused may defend

against this charge by introducing evidence that he lacked the intent to commit first degree murder. *See People v. Eaglin*, 224 Ill. App. 3d 668, 671 (3d Dist. 1992). Whether the state's proof of Fieldman's intent "survive[d] the crucible of meaningful adversarial testing" was for the jury to decide. *Crane*, 476 U.S. at 690–91 (quoting *Cronic*, 466 U.S. at 656).

But the adversarial setting here was skewed. Fieldman's excluded testimony about the circumstances that prompted his actions and statements in the video was "especially relevant" because Fieldman's "entire defense" rested on an argument that his statements to Candler were a charade. *Crane*, 476 U.S. at 691. To show that those statements were a charade, Fieldman sought to testify about the sequence of his escalating interactions with Trina. These interactions, Fieldman asserted, were crucial to his state of mind and showed that he feared Trina would harm him or his family if he didn't meet with Candler. The jury did not hear any of the following material portions of Fieldman's testimony:

- Soon after Fieldman met Trina, she told him about her frightening conduct, including a gruesome murder in which she taped an elderly man to a chair and shot him dead in front of a child, and he feared Trina based on these crimes;

- Trina asked whether Fieldman had ever been mad at anybody because she knew people who would "take care of [it]," specifically mentioning his ex-wife;

- Trina then began asking for information about Fieldman's ex-wife;

- Over the next couple of weeks, Trina persisted in contacting Fieldman and leaving voice messages for him, which he ignored;

- Trina attempted to set up meetings between Fieldman and hitmen in an attempt to obtain money from him;

- Trina angrily demanded several hundred dollars from Fieldman for people who had come in from Chicago to "do the job," but he refused;

- Trina offered to kill his ex-wife herself and said she could find her picture on Facebook without Fieldman's help;

- Trina knew where Fieldman lived with Talia and her sons;

- Fieldman believed Trina was the person who broke into his house and took money shortly before Fieldman's meeting with the hitman;

- Trina continued to initiate conversations with him about killing his ex-wife after he had told her he had no interest in doing so;

- As a result of these interactions, Fieldman grew increasingly concerned for his safety, as well as the safety of his family, and believed that the only way to resolve the situation was to go to the meeting with Candler before going to the police.

In response, the state argues that Fieldman was not deprived of his right to a meaningful opportunity to present a defense because just a "portion" of Fieldman's testimony was excluded. The state points out that he was allowed to "testify in front of the jury that on the day that this happened he felt that he was being pushed by Trina Bennett, he felt uncomfortable, [and] he was concerned because he didn't know what she was going to do." He also testified that he gave Trina false names for himself and his ex-wife; that he avoided Trina's calls because he knew what they "were pertaining to" and "didn't want to call back" because he did not want anybody killed; that he never intended to meet with the hitman despite

twice saying that he would; that he decided to meet with the hitman only because he wanted the badgering "done and over with"; that he was "scared" when he met Candler because he believed he "was in the truck with a killer" and "in over his head"; that he was "concerned" for himself and planned to "get some information and go to the police" so they could apprehend the hitman before he committed the murders; and that he did not go to the police until the following morning because he had to take Talia's children home so she could stay with her sick grandfather. This testimony, the state surmises, was sufficient for Fieldman to present his defense that he lacked the requisite intent to be guilty.

We disagree. The court limited Fieldman to discussing his state of mind on the date he met with Candler, which "virtually prevented" him from testifying about crucial events underlying the state's strongest piece of evidence. *Rock*, 482 U.S. at 55. Fieldman's interactions with Trina, and how those interactions affected his state of mind, were *essential* to explaining why Fieldman met with and hired a hitman if he did not intend for Candler to kill Shelley and Alan. His testimony was "indispensable" to convince the jury to disbelieve the chilling scene that unfolded on video. *Crane*, 476 U.S. at 691. Far from tertiary or collateral to Fieldman's defense, the excluded testimony about events leading up to the recorded meeting went straight to the heart of his claim of innocence.

Like in *Crane*, the jury lacked vital context to weigh Fieldman's credibility about his lack of intent. In the face of the videotape, and without Fieldman's testimony, the jury had no factual basis to credit his bare assertions that he did not intend for Candler to kill Shelley and Alan. The Court's statement about the jury's predicament in *Crane* is an apt comparison to

the jury's deliberations in Fieldman's case, because the video was nearly as inculpatory as a confession:

> Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?

*Id.* at 689.

Likewise, the jury in Fieldman's case needed a critical question answered: If Fieldman is innocent because he lacked intent that Shelley and Alan be killed, why did he apparently hire a hitman to kill them? To provide a sufficient answer, Fieldman needed to present to the jury his excluded testimony about his reasons for his video-captured conduct. But the trial court excluded the heart of this testimony, resulting in a significantly adverse effect on Fieldman's ability to meaningfully present a defense. Accordingly, the trial court's exclusion was contrary to the weighty interest clearly established by *Crane* and *Rock*. *Holmes*, 547 U.S. at 324.

*2. Arbitrary or Disproportionate to the Rule's Evidentiary Purpose*

Having established that the excluded testimony was crucial to Fieldman's defense, we turn now to whether the court's application of the relevance rule was arbitrary or disproportionate to the rule's purpose of ensuring relevant evidence is presented to the jury. *Id.*

When excluding Fieldman's testimony about his interactions with Trina in the four to five weeks before his meeting with Candler, the trial court relied primarily on the evidentiary rule concerning relevance. *See* Ill. R. Evid. 401 (eff. Jan. 1,

2011) ("'Relevant evidence' means evidence having any ten-
dency to make the existence of any fact that is of consequence
to the determination of the action more probable or less prob-
able than it would be without the evidence."). The court fo-
cused on the time frame of Trina's interactions with Fieldman
and determined that events occurring several days before
Fieldman's meeting with the hitman were not relevant to
Fieldman's intent on the evening he met with Candler. For
example, the court stated that Fieldman's interactions with
Trina had no bearing on his intent: "it has absolutely nothing
to do with whether or not he intended Earl Candler to kill his
wife."

When the Illinois appellate court addressed Fieldman's ar-
gument that the trial court's exclusion violated his right to
due process under the Federal Constitution, the Illinois appel-
late court stated that "[a] defendant 'is entitled to an oppor-
tunity to present his version of events within the confines of
our rules of evidence.'" *See Fieldman*, 2013 IL App (4th)
111065-U, ¶ 30 (quoting *People v. Jackson*, 2012 IL App (1st)
100398, ¶ 31). The appellate court concluded that the trial
court's application of Illinois's relevance rule to exclude Field-
man's testimony about his fear of Trina was not an abuse of
discretion. *Id.*

Notably, neither the trial court nor the appellate court en-
gaged in a balancing analysis, considering the importance of
Fieldman's testimony to his defense against the evidentiary
rules; nor did they consider the adverse effect of the ruling on
Fieldman's opportunity to present a defense. *Cf. Holmes*, 547
U.S. at 329–30.

Because the Illinois appellate court relied on principles of
relevance, we limit our discussion of the state's interests

advanced by the Illinois evidentiary rule that "[e]vidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). We begin with the Court's observation that states may exclude evidence that is repetitive, marginally relevant, or presents an undue risk of harassment, prejudice, or confusion of the issues. *Crane*, 476 U.S. at 689–90. Relevance is a rule of efficiency, designed to streamline evidence and to focus the jury on evidence that makes the question of guilt more or less probable. *Cf. People v. Ward*, 101 Ill. 2d 443, 455–56 (1984). The rule aims to limit irrelevant or marginally probative facts so as not to waste judicial resources or to confuse or prejudice the jury.

There is no dispute that relevance requirements serve a legitimate purpose; but it is not enough to show that a rule serves a legitimate state interest. Instead, evaluating whether the rule infringes a defendant's rights "demands [] particularized scrutiny of the application of the rule in each case," so that an "evidentiary exclusion[]" does not "sweep far more broadly" than purposes underlying the rule would justify, and, in that way, apply in an arbitrary manner. *Harris*, 698 F.3d at 635.

In considering whether the application of a rule operates in an arbitrary manner, we have highlighted some considerations the Supreme Court deemed pertinent to that inquiry. *Kubsch*, 838 F.3d at 858.[5] Arbitrariness "might be shown by a

---

[5] We do not believe the five-factor framework announced in *Kubsch v. Neal* is directly applicable to our review in Fieldman's case. 838 F.3d at 858. *Kubsch* announced its framework when discussing *Chambers v. Mississippi*, 410 U.S. 284 (1973), and applied principles distilled from *Chambers* and related cases to a state's application of its hearsay rule to exclude critical witness testimony. But neither *Chambers* nor *Kubsch* relied on a

lack of parity between the prosecution and defense; the state cannot regard evidence as reliable enough for the prosecution, but not for the defense." *Id.* Arbitrariness can also be shown in a court's "refusal to consider corroborating circumstances, an unexplained departure from an established line of decisions, or an assumption about the relative weight of evidence (as in *Crane*)." *Id.*

We think that the trial court's application of Illinois's relevance rule operated in an arbitrary manner because of: (1) a lack of parity between the government and defense, and (2) an unexplained departure from Illinois decisions.

We begin with parity as it relates to the court's limitation on the time frame relevant to Fieldman's state of mind. The trial court mostly limited Fieldman to discussing his state of mind on the date of the meeting with the hitman, reasoning that events occurring between Trina and Fieldman several months (but primarily one month) before his meeting with the hitman could not be relevant to Fieldman's intent on the evening when he met with Candler.

Compare this with the time frame considered relevant to support the state's theory of Fieldman's motive: that Fieldman wanted to have Shelley killed because she asked a court to increase his child-support payments. For example, the court permitted the state to present the following evidence, about Fieldman's motive, some of which dated back

---

defendant's right to testify in his own defense, so we do not rely on a framework tailored to address a different kind of evidentiary exclusion. However, some of *Kubsch* contains a helpful, general discussion of circumstances in which a state evidentiary rule should yield to a defendant's right to present a defense.

to March 2010 (four months before his meeting with the hitman): in May, Shelley filed a petition to modify Fieldman's child-support payments; in March and into June, Fieldman and Shelley were in and out of court for past-due child support; and in March and April, Fieldman and Shelley exchanged text messages about their child-support disputes.

This amounted to lack of parity between the time frame in which evidence was relevant to Fieldman's intent. For the prosecution, evidence about events in the months before Fieldman's meeting with Candler was relevant to his intent. But for the defense, evidence about events in the weeks before that meeting was deemed irrelevant to Fieldman's intent. *Cf. Kubsch*, 838 F.3d at 858.

By itself, this lack of parity makes the court's application of the evidentiary rule to Fieldman's contextual testimony arbitrary. But the arbitrariness of the court's decision is even more pronounced in light of its apparent and unexplained departure from a line of decisions—decisions concerning the relevance of a defendant's own testimony about his intent. For example, in *People v. Perez*, 209 Ill. App. 3d 457, 466 (1st Dist. 1991), the Illinois appellate court explained that "[w]here the intention, motive or belief of the accused is material to the issue, he should be allowed to testify directly to that fact, and to have the circumstances surrounding the act considered in connection with his testimony." *Accord People v. Biella*, 374 Ill. 87, 89 (1940) ("In criminal cases where the intention, the motive or belief of the accused is material to the issue, he is allowed to testify directly to the fact."). In the same vein, the appellate court in *People v. O'Toole*, 226 Ill. App. 3d 974, 988 (4th Dist. 1992), confirmed that out-of-court statements used for purposes other than establishing the truth of the matter

asserted may be admissible—for example "to show or explain the course of conduct" because "the truth of the out-of-court statement is not at issue." We fail to see how the trial court's decision in Fieldman's case is reconcilable with this line of decisions.

To the extent the court was concerned about traditional purposes underlying relevance rules (such as delay, confusion, prejudice, or reliability), an avenue other than a wholesale exclusion of Fieldman's contextual testimony was available to test its reliability. His testimony could have been tested through cross-examination by the state. And if the court was concerned with the reliability of Fieldman's testimony about his interactions with Trina, she was present in the courthouse and available to testify. "Sorting out truthful from untruthful testimony is the essence of the jury's function," *Harris*, 698 F.3d at 638, and at the end of the day, the jury would have been fully capable of determining the weight, reliability, and trustworthiness of Fieldman's testimony. Instead, the jury—charged with determining whether Fieldman intended the hit to be carried out—was left to deliberate without crucial testimony about the reasons behind Fieldman's meeting with Candler. Absent from their consideration was Fieldman's description of his fear of Trina, which rose during five weeks of Trina's increasingly aggressive behavior toward Fieldman.

In sum, when an accused's testimony is essential to the jury's determination of guilt or innocence, the right to present that testimony is part of the defendant's right to testify in his own defense. The court's relevance ruling excluding Fieldman's testimony central to the issue of his intent gravely "infring[ed] upon a weighty interest of the accused," *Holmes*, 547 U.S. at 324 (quoting *Scheffer*, 523 U.S. at 308). And it

"operate[d] in an arbitrary manner in the case at hand," *Kubsch*, 838 F.3d at 858, because it resulted in a lack of parity between Fieldman and the State and departed from Illinois law. Accordingly, we conclude the state court's decision was contrary to clearly established federal law.

*3. Material and Favorable*

Finally, we assume without deciding, that the excluded evidence must be "material and favorable" to Fieldman's defense. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *see also Harris*, 698 F.3d at 627. The exclusion of testimony is material if there is a reasonable likelihood, when viewing the testimony "in the context of the entire record," that the testimony could have affected the judgment of the trier of fact. *Valenzuela-Bernal*, 458 U.S. at 868 (quoting *Moore v. Illinois*, 408 U.S. 786, 112–13 (1972)). A reasonable probability does not mean that the defendant would have more likely than not received a different verdict. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Rather, the inquiry asks whether the exclusion of evidence undermines our confidence in the outcome of trial. *Id.* We conclude that the exclusion of the testimony was material and favorable to Fieldman's defense.

We refrain from repeating our previous analysis about the material—indeed critical—importance of Fieldman's testimony to his defense. But we make several additional points about this testimony as it relates to the evidence the jury received.

Because of the video evidence, the state had a strong case on all elements of the charged crime except intent. The state presented evidence about child-support disputes between Shelley and Fieldman to show why Fieldman may have

wanted to have Shelley killed. But Fieldman testified that those disputes were resolved by mid-June, nearly a month prior to his meeting with the hitman. That chipped away at the state's proof of Fieldman's motive to have Shelley and Alan killed.

Further eroding the state's proof of motive, Fieldman and Shelley both testified that the two had gotten along well in the eight years since their divorce. Shelley testified that Fieldman never acted violently toward her during their marriage. She also testified that, several years earlier, Fieldman provided Alan with a job and a place to live with Fieldman for six months when Alan was out of work. Fieldman testified that he thought of Shelley and Alan as his friends.

But what was the jury to make of testimony about the trio's amicable relationship when faced with a video of Fieldman hiring someone to kill Shelley and Alan? A rational juror would have little reason to credit Fieldman's bare-bones assertion that he only attended the meeting with Candler because Trina badgered him. Why would the jury credit Fieldman's testimony that he felt pushed and badgered by Trina without any explanation about the circumstances giving rise to his fear? Similarly, why would the jury credit his claim that he did not want Shelley and Alan killed without testimony about Trina's actions that made him feel like going to the meeting was necessary to protect himself and his family? Fieldman's excluded testimony would have provided the factual basis for the jury to credit Fieldman's defense; without it, Fieldman was left with a feeble denial that he never intended for Candler to murder Shelley and Alan.

Finally, the excluded contextual testimony could have lent greater significance to testimony that Fieldman made a last-

minute decision to meet with Candler at the Walmart in Pontiac. *Cf. Rock*, 483 U.S. at 57. Fieldman testified that, although he agreed on the phone to meet with Candler, he never intended to follow through with the meeting. For one, he lived in Cullom, nearly a half an hour away from Pontiac. But he changed his mind after a last-minute change in circumstances brought him to Pontiac. About an hour and a half before his meeting with Candler, Fieldman and Talia found out that her grandfather was nearing death. So, they went to her grandfather's house in Pontiac to say their goodbyes. There was understandably a "lot of commotion" at the grandfather's house and Fieldman became "uncomfortable being there." On a whim, he decided that if he was ever going to get Trina off of his back, that was the time. He was in Pontiac, and he knew that Shelley, Alan, and the kids were out of town and out of harm's way. And, no matter what happened, he planned to "go to the police" after the meeting. But, before Fieldman could even attempt to make his way to the police, Talia called and asked him to pick her boys up and take them home so that she could stay with her grandfather. Fieldman agreed; but he was pulled over and arrested while taking them back home.

The interactions between Trina and Fieldman leading up to his meeting with Candler may well have swayed the jury's deliberations. But the jury never heard critical testimony, which, if credited, could have permitted the jury to find that Fieldman lacked the requisite intent to be guilty. As in *Kubsch*, "the jury should have been given the chance to evaluate this case based on *all* the evidence, rather than on the basis of a truncated record that omitted the strongest evidence the defense had." 838 F.3d at 861. We don't ultimately know whether the jury would have credited Fieldman's defense;

but we do believe Fieldman's full testimony "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. As such, Fieldman's excluded testimony was material and favorable to his defense.

### III. CONCLUSION

We AFFIRM the district court's judgment granting habeas relief.