In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 20-1588 & 20-1666

KENNETH SMITH,

*Petitioner-Appellee, Cross-Appellant,*

*v.*

DEANNA BROOKHART, Warden, Lawrence Correctional Center,

*Respondent-Appellant, Cross-Appellee.*

---

Appeals from United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-00271 — **Andrea R. Wood**, *District Judge*.

---

ARGUED NOVEMBER 12, 2020 — DECIDED APRIL 29, 2021

---

Before WOOD, HAMILTON, and ST. EVE, *Circuit Judges*.

WOOD, *Circuit Judge*. Kenneth Smith has been in state prison for nineteen years for a murder and robbery that he insists he did not commit. He achieved limited success in challenging his convictions on March 10, 2020, when the district court held that he is entitled to release unless the state decides

to retry him. *Smith v. Brookhart*, No. 15-CV-00271, 2020 WL 1157356, at *33 (N.D. Ill. Mar. 10, 2020). But Smith was seeking more: an unconditional writ based on the insufficiency of the evidence. See 28 U.S.C. § 2254(d)(2); *Jackson v. Virginia*, 443 U.S. 307 (1979). The state has now appealed from the issuance of the conditional writ, and Smith has cross-appealed from the denial of the unconditional writ.

Even taking the highly deferential view required by section 2254(d), we find that the trial evidence failed to support Smith's conviction beyond a reasonable doubt and that the Illinois Appellate Court was not just wrong, but unreasonable, in holding otherwise. We thus reverse the district court's judgment and order an unconditional issuance of the writ.

## I

### A.  The Crime

Our account of the facts is taken from the state court's findings, which we must accept unless they are unreasonable in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d)(2). (Section 2254(e)(1) further instructs that we must presume that the state court's factual findings are correct. It is unclear how, if at all, these two standards differ, but the state makes nothing of this point, and so neither do we.) Raul Briseno was fatally shot in the parking lot of a Burrito Express restaurant he owned in McHenry, Illinois, on March 6, 2001. *People v. Smith*, 2013 IL App (2d) 120508-U (2013). Around 7:20 pm, two masked men walked into the restaurant while Briseno and his colleague, Eduardo Pardo, stood behind the counter. The first man to enter carried what appeared to be a .22 caliber revolver; the man in tow wore a green jacket. No customers were present.

After the armed man announced a robbery, Briseno grabbed a large kitchen knife and charged towards the pair. The two would-be robbers ran out of the restaurant with Briseno in pursuit; Pardo soon followed.

As the foot chase expanded to nearby streets, Briseno yelled at the driver of a passing car to call the police, and the armed man disappeared. Meanwhile, the man in the green jacket slipped on a patch of ice, permitting Pardo to catch up to him. While the man in the green jacket lay on the ground, Pardo pulled off his mask and got a good look at his face. Pardo picked him up, grabbed his arms from behind his back, and called out to Briseno. At that moment, Pardo heard a gunshot.

Briseno approached Pardo, who continued to clutch the man in the green jacket. Pardo spotted the armed man nearby, now unmasked, as the latter fired another shot. Briseno made it back to Pardo, and the two began to retreat to the restaurant. Walking backwards away from the gunman, Pardo held the man in the green jacket in front of him, while Briseno walked next to them. The shooting resumed. Pardo then heard Briseno make an audible "ahh" sound and spit up blood. Pardo immediately released the man in the green jacket, ran into the restaurant, and called 911.

While on the phone, Pardo could see Briseno holding the man in the green jacket in front of him, using the man as a shield while the shooting continued. After Pardo completed the call, he went back outside, but the two would-be robbers were gone. Briseno lay face down with foamy blood coming out of his mouth, and the kitchen knife lay next to a pool of blood. The police arrived about ten minutes later. Medical

personnel, despite their best efforts, could not save Briseno's life.

Detective Jeff Rhode interviewed Pardo. When asked about what the robbers were wearing, Pardo described the jacket worn by one as green with some black around the collar. Pardo added that the jacket looked like leather and that he did not see any pockets, designs, or zippers on the front.

Lieutenant Gary Wigman led the investigation of the crime scene, but despite the use of metal detectors and magnets, the search turned up neither a gun nor bullet casings. The absence of the latter led the police to surmise that a revolver had been used, because revolvers do not eject casings when fired. A firearms expert later concluded, however, that the bullet in Briseno's body was a .22-caliber long-rifle bullet with six lands and grooves.

Lt. Wigman attended Briseno's autopsy the next day, where he observed a laceration and abrasion on Briseno's upper forehead. The forensic pathologist performing the autopsy determined that the forehead injury was caused by contact with a blunt object and that it was consistent with being pistol-whipped with the barrel of a gun. But the pathologist did not determine *when* that wound occurred in relation to the time of death, leaving open the possibility that Briseno had been injured earlier.

The events of March 6th soon made the news. But in order to assess the credibility of later witnesses, the police withheld two critical pieces of information from the public: (1) that Briseno had yelled into a passing car during the chase, and (2) that Briseno had a head wound consistent with being hit with a gun. Around May 6, 2001, the police obtained and executed

arrest warrants for Kenneth Smith (petitioner here), Justin Houghtaling, Jennifer McMullan, and David Collett. Their theory was that Smith was the gunman; that Houghtaling wore the green jacket; and that McMullan and Collett sat waiting in a nearby getaway car.

## B. Houghtaling's Account

When he was caught in early May 2001, Houghtaling was on a bus to California that was passing through Omaha, Nebraska. For the first 15 minutes of his interview, interrogators from the Omaha police asked him about the Burrito Express shooting. Houghtaling denied any involvement. He also told police that he had taken hallucinogenic drugs just before being arrested. The officers then (falsely) informed him that Smith, Collett, and McMullan already had been charged and had given incriminating statements, and that if Houghtaling told them what happened, they would help him out. They then turned on the tape recorder and proceeded to take Houghtaling's statement, which we now describe.

Houghtaling said that on March 6, 2001, he, Smith, and McMullan were drinking at Collett's house behind the Burrito Express. When he and Smith stepped outside to smoke a joint, Smith said something to the effect of "come with me, I want to go do something." Houghtaling then followed Smith into the Burrito Express:

Q: What were you wearing?

A: I

Q: Did you have a ski mask on your head?

A: I can't remember.

Q: You had your face concealed? Some how [*sic*] you had your face concealed is that correct?

A: Yes.

Q: Ok and how was that?

A: How is what?

Q: How did you conceal your face? With some kind of hat?

A: Yes.

Q: OK and how about Kenneth Smith, how did he conceal his face?

A: With if I'm remembering correctly, with the same with a hat.

Q: With a mask that goes over the face?

A: Yes.

Smith, Houghtaling continued, went into the restaurant first with what "looked like a little 22." After Smith announced the robbery, the owner "grabbed a knife and I ran":

Q: OK, and where did you run when you ran out of [the] restaurant? Are you familiar with that area?

A: No, I'm not.

Q: Ok, did you run behind another building?

A: I honestly can't even remember.

Q: Did you run towards the busy street, route 120, or did you run towards the side street?

A: If I'm thinking correctly, the side street, not the busy one.

Then the man with the knife grabbed Houghtaling. After Smith began firing the gun, Houghtaling said, "the dude let go of me and I ran." Following up, police asked:

Q: Was he firing it towards you?

A: No, he fired it at the guy with the knife.

Q: So there was another guy holding you and another guy with a knife?

Q: That's correct, is it [Houghtaling]?

A: That could be, I can't, it happened so long ago that I don't remember. I'm not a hundred per cent [*sic*] positive, but it could be.

Houghtaling then asserted that he did not see Smith hit the victim on the head with a gun and that *he did not see that anyone involved was either injured or bleeding*. And while Houghtaling initially had told police that he and Smith ran back to Collett's house after the botched robbery, when police probed him further later in the interview, Houghtaling said that they got into a car with Collett and McMullan immediately after the shooting. The police then again asked what he was wearing on that night:

A: I don't remember.

Q: Did you borrow somebody's jacket that night? Were you wearing someone else's jacket?

A: Yea, it was [Collett's].

Q: What color was it?

A: Green, I think.

Finally, the police tried to nail down what kind of .22 Houghtaling observed Smith carrying. Houghtaling was unable to

describe the difference between a revolver and an automatic, and so the police showed him sketches of the two types of gun. He selected the sketch of an automatic.

On May 31, 2001, state authorities indicted Smith based on Houghtaling's taped confession. Houghtaling pleaded guilty on November 14, 2001, and he was sentenced to 20 years' imprisonment in exchange for testifying against the others. Collett also pleaded guilty. Houghtaling and Collett both offered apologies to Briseno's family when they entered their guilty pleas. *Smith*, 2013 IL App (2d) 120508-U ¶ 40 (Houghtaling); *Id*. at ¶ 76 (Collett). (The state makes much of this fact, suggesting that the apologies are evidence of Houghtaling and Collet's participation in the crimes. In our view, however, the apologies are hopelessly inconclusive: it is conceivable that the two apologized out of a sense of guilt; but it is just as conceivable (if not more) that they apologized in the hope of securing a lower sentence. Without a tiebreaker, this evidence helps neither side.)

McMullan was convicted of first-degree murder and armed robbery and sentenced to 27 years. Four months after her trial, Houghtaling wrote her a letter. In it, he said "let me start by saying I'm sorry about what I did to you at your trial. I know I lied and I was bogus. To be honest—and I was bogus." And that was not the only sign, as we will see, of serious problems with Houghtaling's account.

## C. Smith's Trials

### 1. Trials One and Two

Smith's first trial was in 2003. Houghtaling refused to testify, invoking his Fifth Amendment right against self-incrimination. The trial court declared him unavailable and

admitted his testimony from McMullan's trial. But *Crawford v. Washington*, 541 U.S. 36 (2004), intervened, rendering the admission of that evidence unconstitutional and requiring a new trial.

The second trial began in 2008. This time, on direct examination, Houghtaling testified that he and Smith attempted to rob the Burrito Express and that Smith fired the gun. But on cross examination, Houghtaling recanted and asserted that the testimony he had just given was false, except for the fact that he was wearing a green jacket that day. He averred that he was being forced to lie under oath to convict Smith because the state would revoke his plea agreement if he did not do so. As a result of this recantation, Houghtaling later pleaded guilty to perjury and received a 5 1/2-year sentence. The state impeached Houghtaling with his Omaha confession, and the jury found Smith guilty. But the Illinois appellate court ordered a retrial for Smith because of more evidentiary errors.

### 2. Trial Three

#### a. Evidence of Smith's Guilt

At the third trial, held in 2012, the state finally obtained a conviction that the state courts were willing to uphold. Following its now well-worn playbook, it again called Houghtaling as a witness, over Smith's objection. On direct, Houghtaling flatly denied that he and Smith were involved in the shooting. Houghtaling testified that, on March 6, 2001, Smith and McMullan picked him up from his home, and they went to pick up Collett. The group then traveled to the Wisconsin home of one of McMullan's friends to pick up a laptop. They returned to McHenry and stopped briefly at a headshop known as Cloud 9. His account was corroborated

by security footage showing Collett (only) inside the headshop from 7:38 pm to 7:44 pm. The group then proceeded to another friend's house, where they remained for the rest of the night.

The state again read into evidence the transcript from Houghtaling's 2001 Omaha confession and played the audio for the jury. (Note that Houghtaling denied seeing anyone injured or bleeding, and while he claimed to have heard shots, he did not observe that anyone "had been shot." He never directly said that he saw Smith kill Briseno.) The state also introduced Houghtaling's testimony from McMullan's trial. In these prior inconsistent statements, Houghtaling describes the robbery and says that McMullan suggested they go to Cloud 9 for an alibi.

The state also called Pardo to testify. As Pardo recounted the events, two masked men walked into the restaurant to demand money, and he and Briseno chased them out. He described how he captured the man in the green jacket, only to release him to Briseno when the other man began shooting. Pardo was then asked to identify a green jacket obtained from Houghtaling's residence after his arrest in Omaha.

When asked whether that jacket "looked like" the one he saw the night of the shooting, Pardo said yes. But the contemporaneous description Pardo gave of the robber's jacket differs significantly from the jacket marked as Exhibit 66. The jacket identified as Exhibit 66—Houghtaling's jacket—is mostly green. But it also has large black elbow patches, a zipper, black patches running down the middle adjacent to the zipper, and three large pockets on the front. On the night of the shooting, Pardo told Detective Rhode that the jacket worn by the robber lacked pockets or zippers and had only "some"

black, just around the collar. When Smith sought to impeach Pardo by pointing out these discrepancies, Pardo stated that he did not remember how he described the jacket to police that night. To perfect the impeachment, Smith sought to introduce the testimony of Detective Rhode, but he was barred from doing so.

### b. Evidence Implicating the DeCicco Group

Smith also went on the offensive, insisting not only that he is innocent, but also that he had identified the real perpetrators. As he did at his second trial, Smith asserted that a group of three people completely unrelated to himself or Houghtaling, Collett, or McMullan committed the crimes at the Burrito Express. This second group, referred to as the "DeCicco Group," is comprised of Russell Levand (the alleged shooter), Adam Hiland (the wearer of the green jacket), and Susanne DeCicco (an accomplice).

Smith showed that almost from the start, the authorities had received numerous tips that led them to believe Susanne DeCicco was a suspect. She first came to the attention of investigators in November of 2001, when Vicki Brummett (DeCicco's mother) called police to tell them that she believed she was in possession of the .22 caliber revolver used to rob the Burrito Express and kill its owner.

DeCicco recently had confessed to her mother that on the evening of March 6, 2001, she drove around looking for Levand and Hiland and spotted them standing outside of the Burrito Express. She saw them run inside, then quickly run back out with two men in pursuit. One of the restaurant workers ran in front of DeCicco's car and asked her to call the police. DeCicco told her mother that the weapon ultimately used

to kill Briseno belonged to David Brummett, her stepfather and Vicki's husband.

She told Vicki that the victim was hit on the head with the gun, and that as a result, the gun cracked "in the barrel—or the handle." *Smith*, 2013 IL App (2d) 120508-U ¶ 112. After the robbery, the gun was cleaned of hair and returned to the Brummett household. Vicki turned the gun over to the police, and she passed along the details of DeCicco's confession. Although experts "could not identify [the gun] as having fired the bullet that killed Briseno, [they] could not exclude it." *Id.* at ¶ 170. They also "stated that a .22-caliber gun is a very common type of gun, as are six lands and grooves." *Id.* The Brummett .22 had stress fractures on the grips.

DeCicco also confessed to four more people, two of whom were police officers. The first one was her sister, Elizabeth Schwartz. Schwartz had given birth to a baby girl the night before the shooting, on March 5, 2001, and she remained in the hospital for a few extra days. One week later, Schwartz noticed that Hiland had cuts on the inside of his hand and bruises on his arm. Three weeks after the shooting, DeCicco told Schwartz that Hiland was involved in the Burrito Express shooting.

In October 2001, one month before Brummett gave the gun to police, DeCicco told her childhood friend, Brittany Tyda, about how Levand and Hiland tried to rob the Burrito Express. She told Tyda that she saw the owner, wielding a knife, grab Hiland before Levand shot him. Soon after, Tyda overheard an argument between Levand and DeCicco. Levand had threatened to turn DeCicco in for writing bad checks; in response, DeCicco threatened to go to the police "about him

shooting someone." *Smith*, 2013 IL App (2d) 120508-U ¶ 115. Soon after, Tyda told the police what she knew.

Four years later, the confessions resumed. In November of 2005, DeCicco was arrested for retail theft. The police officer in charge of her investigation knew that DeCicco was a suspect in the Burrito Express shooting, and he said that if DeCicco was truthful in providing information about the shooting, he would issue a citation for the retail theft and release her. *Id*. at ¶ 96. When police asked DeCicco about her prior confessions regarding the shooting, she said that she made up the story as a joke. Asked a second time, DeCicco continued to deny involvement. But on the third time, DeCicco stated—on audiotape—that, on March 6, 2001 she was with Levand and Hiland when Levand killed Briseno.

The police then formally interviewed DeCicco on video. DeCicco erroneously stated that the murder occurred on March 5, 2001, the day Schwartz gave birth. She said that on the night of the shooting, she sent Levand and Hiland to go to Vicki Brummett's house to pick up a maternity bag. The two took longer than expected and returned "acting funny." *Id*. at ¶ 97. Later that night, after leaving the hospital and driving to the vicinity of the Burrito Express, DeCicco observed Levand and Hiland handling a gun wrapped in a towel in the trunk of her car. Earlier she had seen the two rummaging in David Brummett's belongings and discussing a gun.

Hiland and Levand then left. *Id*. at ¶ 97. DeCicco recalled that "they had talked before about snatching purses or robbing somebody to get money." *Id.* Twenty minutes later, DeCicco drove around looking for them. She soon witnessed the fateful events unfold at the Burrito Express, with Briseno running up to her car and shouting at her to call the police.

(Recall that this was a detail the police withheld from the public.) She drove away alone.

When she later saw Levand and Hiland, Hiland's face was covered in blood and he had a cut on his hand. Later that night, they cleaned and returned the gun to the Brummett household and burned their clothes. Several months later, Hiland and Levand stole DeCicco's car and burned it with accelerant in a field in Racine, Wisconsin, because the blood stains on the seats would not come off. Smith presented, by stipulation, corroborating police testimony that DeCicco's car was found in Wisconsin in June 2001 destroyed by fire. DeCicco repeated most of this story to Illinois state police in 2006.

Adam Hiland—age 15 at the time of the shooting—also confessed to several people. Two or three months after the shooting, Hiland sat in a van near the Burrito Express, along with DeCicco's sister Schwartz, who was Hiland's cousin. When Hiland became visibly irritated and panicked, Schwartz told Hiland that DeCicco had told her that he was involved in the shooting. Hiland replied: "She is a fat fucking bitch and she can't keep her mouth shut. She needs to keep her mouth shut." *Id*. at ¶ 117. As they drove away, Hiland told Schwartz that he, DeCicco, and Levand had been smoking crack the night of the shooting and that DeCicco had dropped them off in front of the Burrito Express.

In her testimony, Schwartz said that Hiland told her that one of the men grabbed Hiland and tried to stab him, forcing Hiland to grab the knife while calling out for help, and that at some point before or after firing the gun, Levand hit Briseno in the head with the gun.

Hiland also confessed to his friend and roommate Daniel Trumble several times in the summer of 2002. During his first confession, Hiland was shaking and crying while he told Trumble that the "wrong people" were arrested for the murder and that he, Levand, and DeCicco were involved. Trumble later recommended that Hiland speak to a lawyer and arranged for a meeting among Hiland, himself, and Ed Edens, a criminal defense attorney. The three met at a restaurant. There, Hiland confessed to the lawyer and emphasized that Levand was the shooter. The lawyer recommended that Hiland take no action because other people had already been arrested.

Two others also heard Hiland's confession: Gina Kollross and Charlene McCauley. A few days after the shooting, Hiland told Kollross about what happened and how Briseno injured Hiland's arm and hand with a knife. Before Christmas in 2001, Hiland told McCauley how the DeCicco Group had been smoking crack in David Brummett's garage, ran out of drugs, and decided to rob the Burrito Express for money. Hiland did not tell McCauley that he was cut with a knife during the shooting.

Finally, we have Russell Levand. His confession came out through Patrick Anderson, a long-time acquaintance who was incarcerated with Levand in 2011. That summer, Levand told Anderson that he was involved in the shooting but that he was not worried about being prosecuted because the state had the gun, yet nothing had come of it. Anderson initially tried to alert the police through a tip line. That went nowhere, and so in 2011 he directly contacted Smith's attorney through a letter, in which he repeated Levand's confession.

In fact, Anderson had a longstanding suspicion that Levand was involved with the Burrito Express incident. One week before the shooting, Levand accompanied Anderson to the Burrito Express to purchase drugs from a man who was associated with Briseno. While there, Levand learned from Anderson that Briseno was Anderson's source of high-quality cocaine. In the letter to Smith's defense attorney, Anderson mentioned that he told Levand that Briseno "at times" kept cocaine and large sums of cash inside the Burrito Express.

All the DeCicco witnesses testified at Smith's third trial: DeCicco herself, Vicki Brummett, Schwartz, the two police officers who conducted DeCicco's recorded interviews, Rexford (DeCicco's half-sister), Hiland, Trumble, Kollross, McCauley, Levand, and Anderson. Both of DeCicco's taped confessions were played to the jury.

But their testimony did not carry the day for Smith. DeCicco told the jury that she had lied in her confessions. She said that she only pretended to have information so that the police would treat her favorably (*i.e.*, drop the retail theft charges and let her go), and so that her family would give her money and sympathy. Levand denied having confessed to Anderson or being at the Burrito Express on March 6, 2001. Hiland limited his testimony to a denial that a scar on his hand came from Briseno's knife. The jury thus had conflicting accounts about the DeCicco Group's involvement.

### c. Conclusion of Third Trial

The state had no physical evidence linking Smith to the crime. There were no fingerprints from him or Houghtaling at the scene. No DNA evidence. And no blood that could be linked to Smith or Houghtaling. But at the conclusion of his

third trial in 2012, after twenty-one hours of deliberation, the jury found Smith guilty of attempted armed robbery and first-degree murder. The court imposed a sentence of 67 years on the murder count and a concurrent sentence of seven years on the robbery count.

## D.  Contested Evidentiary Rulings

Three evidentiary rulings made by the trial court became the focal point of Smith's appeals. They are relevant primarily to Smith's back-up effort to obtain a new trial, not to his claim that the evidence *before* the jury was insufficient to support his conviction. First, the trial court barred Anderson from testifying that he told Levand that Briseno sold drugs out of the Burrito Express. This ruling kept out crucial evidence of motive and earlier connections. Second, the court did not allow Trumble to testify that a criminal defense attorney was present when Hiland confessed a third time. Third, the court barred Smith from asking Det. Rhode how Pardo described the jacket on the night of the murder.

On direct appeal, Smith argued (among other things) that these evidentiary exclusions violated his constitutional right to present a complete defense. He also argued that no trier of fact could have found him guilty beyond a reasonable doubt based on the evidence. The Illinois appellate court affirmed his conviction. *People v. Smith*, *supra*, 2013 IL App (2d) 120508-U.

Smith then sought a writ of habeas corpus from the federal court. See 28 U.S.C. § 2254(d)(1). He argued that the state appellate court had unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979), in finding that there was sufficient evidence for a jury to find his guilt beyond a reasonable doubt. Despite

acknowledging that "the evidence of the DeCicco Group's in-volvement [was] highly compelling if not conclusive," *Smith v. Brookhart*, No. 15-CV-00271, 2020 WL 1157356, at *19 (N.D. Ill. Mar. 10, 2020), the district court felt bound to defer to the state court's conclusion that the evidence of Houghtaling's re-canted confession and Pardo's identification of the green jacket just barely supported the convictions.

Nonetheless, the court held that Smith was entitled to a new trial because of the three evidentiary exclusions we just described. The court found that these rulings violated Smith's federal constitutional right to present a complete defense and engage in effective cross-examination, and so it ordered issu-ance of the writ, subject to the state's decision whether to con-duct a new trial. As we noted earlier, the state has appealed from that decision, and Smith has cross-appealed from the court's rejection of an unconditional writ (through an ongoing representation by recruited counsel from the law firm of Jen-ner & Block LLP, to whom we are thankful).

## II

### A.  The *Jackson* Rule

*Jackson v. Virginia* holds that criminal convictions must stand unless "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. 307, 324 (1979). When conduct-ing a sufficiency-of-the-evidence inquiry on a habeas corpus petition, "the only question under *Jackson* is whether [a] find-ing [is] so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). If "the state court of last review did not think" the finding of guilt was irrational, AEDPA mandates that the federal court

give that decision "considerable deference" and uphold the conviction. *Id*. Finally, the Supreme Court has instructed that "the sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.'" *Herrera v. Collins*, 506 U.S. 390, 402 (1993), citing *Jackson*, 443 U.S. at 318. All of the evidence recounted above appears in the record.

The relevant question is *not* whether we disagree with the state court's resolution of the case. AEDPA deference would mean little if the test were so lenient. Instead, we must find the decision not just wrong, but well outside the boundaries of permissible outcomes. Put otherwise, a federal court "may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because [it] disagrees with the state court. … [It] may do so only if the state court decision was objectively unreasonable." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quotation marks omitted).

When a federal court faces conflicting inferences that can be drawn from the evidence—one pointing to culpability and the other pointing to innocence—the court must "review the evidence 'in the light most favorable to the prosecution'" and accept the inference that supports the prosecution's theory of the case. *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (citing *Jackson*, 443 U.S. 319) (reversing a grant of a habeas corpus petition when it appeared that the reviewing "court's recitation of inconsistencies in the testimony show[ed] [that] it failed" properly to resolve conflicting inferences in favor of the prosecution).

*Jackson* and AEDPA thus leave only a narrow path for the federal writ of habeas corpus. Even so, in the rare case a successful sufficiency challenge is possible. See, *e.g.*, *Tanner v. Yukins*, 867 F.3d 661 (6th Cir. 2017). The Court itself in *Jackson*

cautioned that a "jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 317. Further, when conducting this inquiry, we do not ask whether there was "*any*" evidence that would support the conviction. *Id*. at 313, 320 (it "could not seriously be argued" that a "mere modicum" of evidence could "by itself rationally support a conviction beyond a reasonable doubt"). Rather, relief is appropriate "only if the record is devoid of evidence from which a reasonable jury" could find the requisite guilt beyond a reasonable doubt. *United States v. Hills*, 618 F.3d 619, 637 (7th Cir. 2010).

The district court did not pay sufficient heed to the distinction between the "any-evidence" rule that *Jackson* repudiated and the more qualified "no evidence from which a jury could find guilt beyond a reasonable doubt" rule the Court articulated. Instead, the district court reasoned that "[s]o long as the record is not 'devoid of evidence' of a habeas petitioner's guilt," relief could not issue. *Smith*, 2020 WL 1157356, at *19. It thought that Houghtaling's recanted confession and Pardo's identification of the green jacket squeaked over the "devoid of evidence" line, and it felt constrained not to "weigh[] the evidence or second guess[] the jury." *Id*. But "devoid of evidence" is not the correct standard, and we are permitted even under AEDPA to correct this type of legal error. *Avila v. Richardson*, 751 F.3d 534, 536 (7th Cir. 2014).

### B. Sufficiency of Houghtaling's Evidence

#### 1. The Green Jacket

The state puts a lot of stock into Pardo's statement that Houghtaling's jacket (shown to Pardo at the trial) "looks like" the green jacket he saw on March 6, 2001. It asks us to infer

that Pardo was actually saying that he believed Houghtaling's jacket was *the* jacket he saw that night—not merely that one green jacket "looks like" another green jacket. But that is not an inference; it is a recharacterization of the evidence. Pardo was not asked, and he did not say, that he was looking at "the" jacket. That falls well short of a positive identification.

### 2.  The Omaha Confession

A jury is entitled to credit witnesses as it deems fit. Nonetheless, *Jackson* leaves room for instances in which the jury's ultimate decision to convict cannot stand because a reasonable doubt remains. In applying *Jackson*'s test, we must consider "all of the evidence admitted by the trial court." *McDaniel*, 558 U.S. at 131, quoting *Lockhart v. Nelson*, 488 U.S. 33, 41 (1988). With that in mind, we must assess whether the state court's rejection of the proposition that no reasonable juror could have sustained a conviction beyond a reasonable doubt was reasonable.

Even viewed through that deferential and favorable lens, Houghtaling's Omaha confession falls short, especially when viewed alongside the DeCicco Group's interlocking and corroborated confessions. We accept that Smith's 2012 jury thought that Houghtaling was truthful in his Omaha interview, truthful at McMullan's 2008 trial, and dishonest at Smith's trial. But truthful about what? In Omaha, Houghtaling said that he saw Smith firing the gun, but he denied seeing anyone get shot, and he said that he did not see anyone who was either injured or bleeding. At McMullan's trial, he said that Briseno and Pardo grabbed him, and he saw (or felt) Briseno fall down after Smith fired shots. That is as close as he comes to describing the killing.

The state urges that this is enough. The Omaha and McMullan accounts were reliable, the state argues, because at the time of his arrest in Omaha, Houghtaling had not yet struck a plea deal with the state and so had no incentive to lie. The state explains away Houghtaling's recantation at Smith's second trial as motivated by a desire to save his own skin while he challenged his own conviction.

Smith counters that Houghtaling had many reasons to be less than truthful in Omaha: the police told him that he already had been incriminated; they promised to take it easy on him if he cooperated; and he was high on hallucinogens. As for the recantation, Smith argues that the only way to understand Houghtaling's willingness to accept an additional five and a half years of imprisonment for perjury is that he was at long last trying to come clean.

If this were just a credibility assessment, we would be required to defer to the jury. Juries may rely on one witness even if his testimony is contradicted by a phalanx of others. But Houghtaling was not an independent witness: he provided not a single detail that the police did not already know. When pressed at oral argument to name one fact from Houghtaling's Omaha confession that was (1) factually consistent with Pardo's eyewitness testimony and the investigation, (2) not prompted by a leading question by police officers, and (3) not publicly known, the state was unable to oblige. (We focus on the Omaha confession because by the time Houghtaling testified at McMullan's trial, he had reviewed the police reports and received coaching from the state.)

The state's failure was not for lack of effort. For example, the state attaches great weight to Houghtaling's statement that Smith carried a .22 caliber handgun. But this requires one

to overlook the fact that Houghtaling, when later asked to choose between a drawing of an automatic (the wrong gun) and of a revolver (the correct gun), he chose the wrong one. And the state downplays the ballistic expert's inability to exclude the Brummett .22 as the murder weapon, emphasizing that the .22 is a "very common type gun." But the state is notably quiet on the .22's popularity when explaining how critical it was that Houghtaling correctly said that Smith carried "a little 22."

The state also notes that Houghtaling correctly stated that the chase unfolded on the side streets, not the "busy" streets. But as the transcript we reproduced earlier shows, this statement was prompted by leading questions with a 50% chance that Houghtaling would guess right.

What stands out most is what Houghtaling omitted or got wrong. Houghtaling failed to mention that one of the men in pursuit stopped and yelled something at a passing car. He does not even mention that two men were in pursuit. When asked point-blank whether he recalled Briseno being hit "with the gun or anything," Houghtaling unequivocally answered no. It is pure speculation to guess that he may not have noticed these details, despite allegedly being a key player in the attempted robbery. His lack of knowledge stands in stark contrast to the admissions from the DeCicco Group.

There is no way around the fact that Houghtaling's Omaha confession, later reincarnated at McMullan's trial, is riddled with holes. Although *Jackson* and AEDPA require us to view the evidence in the light most favorable to the prosecution, they do not invite us to make up facts. Houghtaling's testimony and the green jacket are a thin reed indeed on which to try to base a conviction. And we must view that

evidence—and apply *Jackson*—based on the record as a whole. That record critically includes the compelling evidence relating to the DeCicco Group, to which we now turn. As we now explain, the DeCicco Group's confessions, along with the weakness of the other evidence, compel us to conclude that no rational juror could have found Smith guilty.

## C.  The DeCicco Group

The state reminds us that despite the evidence of the DeCicco Group's culpability that Smith was able to introduce at his third trial, the jury found that Smith committed the crime. But if we remove the green jacket from the picture and recognize the holes in the Omaha interview, the DeCicco evidence adds powerfully to the existence of the reasonable doubt we see here.

DeCicco herself confessed to five different people, two of whom were law enforcement officers. Even viewing the evidence in the light most favorable to the state, the substance of her confession is hard to get around. Soon after the shooting, DeCicco told friends and family the very two key facts that police intentionally withheld from the public so that they could later ascertain the credibility of confessions: first, that the victim yelled into a passing car (which, in DeCicco's confession, was driven by her); and second, that the victim may have sustained a blunt-force head injury.

She even told state police during her 2006 interview that the blunt-force injury "was not in the papers anywhere. How would I know that unless the people who did it actually told me?" *Smith*, 2013 IL App (2d) 120508-U ¶ 170. The appellate court tried to offer an alternative explanation for DeCicco's insider knowledge: that "this non-public information was not

kept as secret from the public as the police desired." *Id*. But nothing in the record supports this possibility.

Furthermore, DeCicco's confessions did not stand alone. Levand and Hiland made confessions that corroborated the same basic facts, and the record contains nothing indicating that either one had an incentive to do so falsely. Again, while *Jackson* and AEDPA require us to view all evidence in the state's favor, *Jackson* does not require us to draw the remarkable inference that an entire package of cross-corroborated confessions came into existence from pure happenstance or a deliberate conspiracy to mislead friends, family, and police. There is no basis in the record to support such an improbable idea. And other evidence is also nearly impossible to disregard. Perhaps Levand and Hiland stole and burned DeCicco's car in a field to make their lies more credible. But nothing supports that version of the facts. *Jackson*, 443 U.S. at 325. It is notable that it was DeCicco's *own family members* who came forward to the police.

Finally, consider the injuries on Hiland's body and the lack of injuries on Houghtaling. Several eyewitnesses testified to seeing Hiland in the days after March 6, 2001, with his hand bandaged and his arms bruised. Hiland even told some of these witnesses that he had sustained the injuries in a scuffle while committing the Burrito Express robbery. Of course, Hiland also had a different story. He told some people that he got his injuries when he fell down icy stairs. And at Smith's 2012 trial, he told the jury that he got a scar on his hand when fleeing from police a few years earlier.

But what is notable, and undisputed, is that Houghtaling had no injuries after the incident. The day after the Burrito Express shooting, Houghtaling *went to the police station*

wearing the same green jacket that was later admitted into evidence. Police there observed neither injuries on his body nor any blood stains or cuts on the jacket. The appellate court tried to deal with this damning fact by suggesting that Houghtaling's "lack of physical injuries … do not cast doubt on his credibility, where it was undisputed that the green leather jacket he wore covered his arms." *Smith*, 2013 IL App (2d) 120508-U ¶ 165. But as we noted earlier, the record does not establish that Houghtaling's jacket and that of the robber were one and the same. While the jacket's color is undisputed, Pardo stated at trial only that the jacket "looked" like leather. We note that an examination of the garment tag inside the jacket indicates that the exterior shell is made of PVC casting leather (*i.e.*, vinyl) and rayon—much more affordable (and less durable) than real leather. While a fair-minded jurist might reasonably conclude that leather could shield someone from physical injuries such as knife cuts or bruises, this conclusion is more tenuous for a jacket with a vinyl exterior.

The appellate court made one final error worth highlighting. On direct appeal, Smith emphasized that the crime scene was bloody but that the evidence showed that neither he nor Houghtaling had blood on their clothes that night or the next day. In contrast, the testimony indicates that Hiland was covered in blood. In response, the appellate court remarked that Smith's "characterization of the crime scene as bloody is not supported by the evidence." *Smith*, 2013 IL App (2d) 120508-U ¶ 165. This is simply incorrect. One has only to look at the rather grisly photos in the record of the crime scene and of the final outfit worn by Briseno on March 6, 2001, to see that Smith's statement is accurate: Dkt. 1-12 (Appx. Vol. 12-1, Ex. 33-39); Dkt. 1-13 (Appx. Vol. 12-2, Ex. 44); Dkt. 1-18 (Appx. Vol. 12-7, Ex. 131, 132); Dkt. 1-19 (Appx. Vol. 12-8, Ex. 133).

Our point here is not to adjudicate the DeCicco Group's guilt. The evidence implicating them is relevant because it casts a powerful reasonable doubt on the theory that Smith and Houghtaling were the robbers that night. Houghtaling's inconsistencies take on a special significance in light of the DeCicco evidence—evidence that builds a narrative largely free from the holes that fill Houghtaling's confession. With such a serious possibility of a third party's guilt, *cf. Chambers v. Mississippi*, 410 U.S. 284 (1973) (finding constitutional violation when defendant was blocked from full presentation of his defense and a third-party had confessed), we are convinced as an objective matter that *no* rational trier of fact could have found Smith guilty beyond a reasonable doubt. The appellate court was unreasonable to hold otherwise.

### III

Because we have found that the state court unreasonably applied *Jackson* when it determined that there was sufficient evidence to support Smith's conviction, we technically have no need to reach the evidentiary errors Smith raised. As we noted at the outset, our *Jackson* determination is based on the evidence actually introduced at trial, without regard to any error in either inclusion or exclusion. We think it helpful, however, briefly to address Smith's evidentiary arguments. A look at why they were prejudicial sheds further light on the inadequacy of the evidence at trial to convict him.

To determine whether a state evidentiary ruling passes muster under *Chambers*, we must balance a state's legitimate interest in an efficacious "criminal trial process" against the defendant's constitutional rights to present a complete defense, with a heavy thumb on the side of the state court's resolution of that issue. In *Kubsch v. Neal*, 838 F.3d 845, 855 (7th

Cir. 2016) (en banc), we explained our understanding of the Supreme Court's *Chambers* line of cases. Habeas corpus relief is available, these cases hold, when a state court presiding over a murder trial arbitrarily applies an evidentiary rule to exclude "reliable and trustworthy" evidence that is essential to the defense and not otherwise inadmissible. *Id.* at 858.

Relying on the Supreme Court's decisions in *Crane v. Kentucky*, 476 U.S. 683 (1986), and *Rock v. Arkansas*, 483 U.S. 44 (1987), we recently found that a state court unreasonably applied Supreme Court precedent when it excluded this type of evidence. *Fieldman v. Brannon*, 969 F.3d 792 (7th Cir. 2020). The trial court did not permit the defendant to present evidence that would have offered an innocent explanation for his meeting with a potential hitman. In finding for the petitioner, we noted the lack of parity between the prosecution and the defense with respect to the period "in which evidence was [deemed] relevant to Fieldman's intent." *Id*. at 808. For the prosecution, that period stretched back for months; for the defense, a few weeks was too long. That left the jury adrift, trying to understand the defendant's intent without crucial evidence. We thus ordered the issuance of a conditional writ, permitting the state to retry the defendant.

The same principles apply to the exclusion of the three pieces of evidence that Smith challenges, particularly those that fit within the DeCicco Group's web of cross-corroborated confessions. The first and most significant was Anderson's testimony regarding Briseno's cocaine dealing and Levand's knowledge of that side-business. This was central to the issue of motive—one of the glaring lacunae in the case against Smith. It would have shown that the DeCicco Group had a specific reason to rob Briseno, while Smith and his friends did

not. Neither reason given by the state appellate court for keeping the evidence out holds water. Anderson's statement was not inconsistent with the evidence indicating that the robbers were looking for money. Anderson just added the fact that the group sought money for the purpose of getting drugs and so went to a place where both might be found. Where illegal drugs are being sold, there is likely cash on hand. See, *e.g.*, *United States v. Lawrence*, 788 F.3d 234, 242 (7th Cir. 2015). Moreover, Smith's goal in introducing this testimony was not to establish that Briseno was selling cocaine from the Burrito Express. Rather, it was to show that the DeCicco Group—in particular Levand—might have *believed* that to be the case. This evidence was vital to Smith's defense.

Second, the state trial court erred by excluding critical testimony about Hiland's confession to his friend and roommate, Trumble. Trumble was ready to testify that he witnessed Hiland confess to a criminal defense attorney. The appellate court affirmed the exclusion on hearsay grounds. But that analysis was incomplete, because state law does not have the last word in these situations. Throughout the trial, the state sought to undermine the confessions from members of the DeCicco Group—Hiland's in particular—by suggesting that group members had social incentives to lie. For example, the state speculated, Hiland may have wanted to look tough in the eyes of his friend Trumble. But these explanations say nothing about what Hiland had to gain by falsely boasting to a disinterested lawyer that he had participated in a murder/robbery. The excluded evidence from Trumble would have shown that Hiland was concerned with legal jeopardy, took his concern seriously enough to seek out legal advice, and made a confession that was consistent with his prior

confessions, without the social pressures that may have previously driven him to take liberties with the truth.

The exclusion was also arbitrary, insofar as the trial court allowed the state to provide context for Houghtaling's confession, but it barred Smith from doing the same for Hiland's. And this exclusion was not harmless. In concluding otherwise, the appellate court reasoned that it was enough that the jury heard DeCicco's statement that Hiland told her that he spoke to an attorney and the proffered evidence was cumulative. But DeCicco's statement was no substitute for Trumble's. Trumble added critical new facts, while DeCicco's version was consistent with two diametrically opposed inferences: Version 1, that Hiland met with the attorney because he feared being *wrongly* prosecuted for crimes that he did not commit, or Version 2, that he had the meeting because he feared *rightly* being prosecuted for crimes he did commit. Trumble's testimony erases this ambiguity, and its exclusion seriously prejudiced Smith.

The third problematic evidentiary call came when the trial court prevented Smith from further impeaching Pardo's testimony through Detective Rhode. Rhode's additional testimony would have revealed inconsistencies between Pardo's description of Houghtaling's jacket on the night of the murder and his identification of the jacket shown to him at trial. Smith wanted the jury to know that the jacket Pardo described on March 6, 2001 had black around the collar but no pockets or designs or a zipper, while Houghtaling's jacket (seen at trial) had three large front pockets, a front zipper, a small patch of black underneath the collar, and large black elbow patches.

Smith contends that the decision to bar Rhode's testimony violated his rights under the Confrontation Clause and

*Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986), which entitles criminal defendants to an "opportunity for effective cross-examination." The appellate court implicitly conceded error but held that the exclusion was harmless. Given the centrality of the jacket to the prosecution's theory, we see no way that this call was harmless. The appellate court thought that the discrepancies between Houghtaling's jacket and the one described by Pardo "were minor and could not have contributed to the verdict." *Smith*, 2013 IL App (2d) 120508-U ¶ 229. But apart from being mostly "green," the jacket seized from Houghtaling looks nothing like the jacket Pardo described.

Taken together, as the district court properly held, these errors deprived Smith of his right to a fair trial. See *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000). The state asks us to defer to the appellate court's determination that Smith got a fair trial because he was able to present over twenty "witnesses, including eight who testified that one or more of DeCicco, Hiland, and Levand confessed to them, and two recordings of DeCicco's confessions to police." But prejudice is not a matter of head-counting. It requires an assessment of the effect of the errors on the proceeding.

In a habeas corpus case where a claim of harmless error has been raised, the Supreme Court has established the following standard of review: "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (cleaned up); see also *Davis v. Ayala*, 576 U.S. 257, 267–68 (2015). *Ayala* added that "[t]here must be more

than a reasonable possibility that the error was harmful." 576 U.S. at 268 (cleaned up). Where, as here, the state court has evaluated harmlessness, relief under section 2254(d)(1) is not authorized unless that harmlessness determination itself was unreasonable. *Id.*[1]

Difficult though that standard is, we conclude that Smith has met it. But for the exclusions, the jury would have learned that the DeCicco Group had a specific motive to rob the Burrito Express and that one of the group's members made a confession bearing indicia of credibility far exceeding those of the other confessions on record. Further, the jury would have learned that the state's only eyewitness offered inconsistent testimony about the jacket, casting into doubt the only piece of tangible evidence linking Houghtaling—and therefore Smith—to the crime. For these reasons, and all the others we have reviewed in detail above, we conclude that the state court's determination of harmlessness was unreasonable and thus cannot stand. Although this holding primarily affects the need for a new trial, it also sheds light on the insufficiency of the evidence as actually presented and reinforces our conclusion that Smith is entitled to issuance of the writ.

---

[1] We recognize that the Sixth Circuit held, in *Davenport v. MacLaren*, 964 F.3d 448 (6th Cir. 2020), that a state court's findings are not relevant in a case governed by *Ayala*, and ultimately by *Brecht v. Abrahamson*, 507 U.S. 619 (1993) (introducing the "substantial and injurious effect or influence" test). The Supreme Court has granted certiorari to decide whether, in a habeas corpus proceeding under section 2254, a federal court may grant relief based solely on *Brecht*, or if it must also find that the state court's application of the relevant standard was unreasonable for purposes of 28 U.S.C. § 2254(d)(1). See *Brown v. Davenport*, No. 20-826, 2021 WL 1240919 (U.S. Apr. 5, 2021). The outcome of *Brown* will not affect our case, since our court has adopted the latter, more stringent, standard.

**IV**

We REVERSE the district court's holding that the evidence was constitutionally sufficient to sustain Smith's conviction. Accordingly, we remand the case to the district court with instructions to grant the petition for a writ of habeas corpus unconditionally and order the immediate release of Kenneth Smith from state custody.